1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9               WESTERN DISTRICT OF WASHINGTON
                            AT SEATTLE
10
   DANIEL WAKGIRA,                    CASE NO. C08-1108JLR
11
                  Plaintiff,          ORDER ON MOTION FOR
12                                    SUMMARY JUDGMENT
       v.
13
   CITY OF SEATTLE, et al.,
14
                  Defendants.
15

16         This matter comes before the court on Defendants Officer Anthony Lyndell Jones

17  and the City of Seattle's ("City") motion for summary judgment (Dkt. # 25).  Having

18
    reviewed the motion, as well as all papers filed in support and opposition, and deeming
19
    oral argument unnecessary[1], the court GRANTS in part and DENIES in part the motion.
20

21                        I.    BACKGROUND

22         On August 30, 2007, approximately 66,700 football fans watched the Seattle
23
    Seahawks defeat the Oakland Raiders at Qwest Field in downtown Seattle, Washington.
24

25  _____
         [1] Neither party requested oral argument on this motion in accordance with Local Rules
26  W.D. Wash. CR 7(b)(4).

ORDER - 1

After the game, at around 10:25 p.m., those same fans flooded the streets as they traveled home by foot, bus, and car.  (Declaration of Peter Mullenix ("Mullenix Decl.")) (Dkt. # 26), Ex. 2 ("Pl. Admis.") ¶ 2.)  Pedestrian and vehicle traffic "was heavy due to the large number of people who were leaving Qwest Field" after the football game.  (*Id.*)

In the midst of this activity, Officer Jones of the Seattle Police Department was directing vehicle and pedestrian traffic from the center of the intersection of Fourth Avenue South ("Fourth") and South Royal Brougham Way ("Royal Brougham").  (Pl. Admis. ¶ 3; *see* Mullenix Decl., Ex. 3 (Deposition of Anthony Jones) ("Jones Dep.") at 46.)  Fourth runs north and south while Royal Brougham runs east and west.  The intersection includes over 20 different lanes of traffic.  (Praecipe to Jones Dep. (Dkt. # 28), Ex. A.; Declaration of Daniel Wakgira ("Wakgira Decl.") (Dkt. # 33), Ex. A.)  At the time of the incident, Officer Jones was wearing a uniform of the Seattle Police Department (Pl. Admis. ¶ 7), a neon green vest (Pl. Admis. ¶ 4), and gloves "that were lime green, black with a red stop sign in the palm," (Jones Dep., Ex. 3.), and he was holding a plastic flashlight with a bright orange cone affixed to the end of it (Pl. Admis. ¶ 5).  The overhead traffic signals in the intersection were flashing red.  (Pl. Admis. ¶ 8.) Officer Edward Lukaszeski of the Seattle Police Department and Parking Enforcement Officer Michael Herron were assisting Officer Jones.

Plaintiff Daniel Wakgira is a 59-year-old man who has lived in the Seattle area since 1972.  (Declaration of Lembhard G. Howell ("Howell Decl.") (Dkt. # 31), Ex. B (Deposition of Daniel Wakgira) ("Wakgira Dep.") at 5.)  On August 30, 2007, Mr.

Wakgira attended the football game at Qwest Field along with his brother, Gobena Wakgira, and a friend, Soloman Biruk. (*See* Wakgira Dep. at 10.) After the game, Mr. Wakgira proceeded to drive his brother and Mr. Biruk to their cars, which had been parked farther away from Qwest Field. (*Id.*) Mr. Wakgira sat in the driver's seat with Mr. Biruk beside him in the front passenger's seat and his brother directly behind him in the back seat. (*Id.*) Mr. Wakgira's driver's side window was open. (Wakgira Dep. at 17-18.)

Prior to the incident, Officer Jones had been allowing cars to travel north and south on Fourth. (Jones Dep. at 38.) He heard a whistle from the direction of the Qwest Field parking garage, which meant cars would soon be traveling eastbound out of the parking garage on Royal Brougham, and therefore he stopped the northbound and southbound traffic. (Jones Dep. at 38, 40, 46-47.) Officer Jones then stopped the pedestrians from crossing north and south on the east side of Fourth and started eastbound traffic on Royal Brougham. (Jones Dep. at 46-47.)

The farthest left of the four eastbound lanes on Royal Brougham is a left turn lane that turns north onto Fourth. (Jones Dep. at 47.) Officer Herron explains that, at times, when there are not many cars in the left turn lane the officers may stop traffic from turning left in order to expedite pedestrians crossing from the northwest to the northeast corner. (Mullenix Decl., Ex. 4 (Deposition of Michael Herron) ("Herron Dep.") at 21.) In this type of situation, Officer Jones would signal to Officer Herron that he had stopped traffic from turning left and that Officer Herron could allow pedestrians to

cross.  (*Id.*)  If Officer Jones subsequently decided to allow traffic to turn left, he would signal to Officer Herron to stop pedestrians from crossing.  (*Id.*)  Officer Jones states that, at the time of the incident, no cars driving eastbound on Royal Brougham were in the left turn lane.  (Jones Dep. at 47.)  He also claims that pedestrians were crossing from the northwest corner to the northeast corner, although this statement is disputed by a range of other witnesses, as discussed below.  (*Id.*)

When Mr. Wakgira arrived at the intersection traveling north on Fourth, he saw Officer Jones directing traffic along with Officers Lukaszeski and Herron.  (Wakgira Dep. at 11-13.)  He recognized Officer Jones as a police officer and understood that he was directing traffic.  (*Id.* at 15-17.)  Officer Jones stopped Mr. Wakgira at the intersection for several minutes.  (*Id.* at 19; *see also* Jones Dep. at 79.)

The parties disagree as to what happened next.  For his part, Mr. Wakgira states that Officer Jones looked directly at him, signaled for him to drive into the intersection with a movement of his flashlight, and blew his whistle.  (Wakgira Dep. at 25-26; *see* Howell Decl., Ex. E (Deposition of Soloman Biruk) ("Biruk Dep.") (Dkt. # 31-6) at 16.)  Mr. Wakgira drove very slowly into the intersection.  (Biruk Dep. at 17; Howell Decl., Ex. D (Deposition of Jeanna Pruitt) ("Pruitt Dep.") (Dkt. # 31-5) at 8.)  When Mr. Wakgira reached the middle of the intersection next to Officer Jones, he heard Officer Jones say something through the open window but did not understand what Officer Jones had said.  (Wakgira Dep. at 26.)  Mr. Wakgira asked Officer Jones, "What did you say?"  (*Id.*)  He repeated this question three times.  (*Id.*)  Without further prelude,

Officer Jones hit Mr. Wakgira on the forehead above his right eye with the plastic flashlight.  (*Id.*)  Although the precise sequence of Mr. Wakgira's narrative is difficult to follow, Mr. Wakgira contends that, after the first blow, Officer Jones indicated that he should stop the car, that Mr. Wakgira told him he would stop the car but that he needed a chance to do so, that he could not see after being hit by the flashlight, both because the blow had knocked off his glasses and because he was bleeding from his forehead directly above his right eye.  (Wakgira Dep. at 27; Wakgira Decl. ¶ 8.)  Officer Jones then hit Mr. Wakgira with the flashlight a second time in the face—and possibly a third and a fourth time—and reached into the car through the open window to take the key out of the ignition.  (Wakgira Dep. at 27, 35-36.)  Mr. Wakgira allegedly told Officer Jones that the key could not be removed without putting the car in park.  (Wakgira Dep. at 27.)  Mr. Wakgira parked at the northeast corner of the intersection and Officer Jones took the key out of the car.  (Wakgira Dep. at 30, 40.)  He states that Officer Jones was hitting him "all the time."  (Wakgira Dep. at 28.)  In his deposition, Mr. Wakgira described the core facts of the incident as follows:

> As he was hitting me with the flashlight, he said – and then I said, okay – you know, I was bleeding and I didn't see.  I said, I can't see, I can't see. And I said to him, I will stop, I will stop; just give me a chance.  And then he had his hand and he said, I'm going to put you in jail tonight, I'm going to put you in jail tonight; that's what he was saying.  And then hit me again. You're going to spend the night in jail; that's what you deserve.  And then I said, just let me stop.  I couldn't stop and then he had his hand – he was raising it and I said, just a minute.  And I was, you know – I couldn't see and I can't see, I can't see.  Then I put my brake on finally and I came here to a stop and then he tried to take the key.  I said, you can't take the key.  I have to put it in park.  I kept on telling, you have – You can't just take it

out. It's just not a car you can take a key. So I parked. That's when he took the key out.

(Wakigra Dep. at 27.) Mr. Wakgira states that Officer Jones repeatedly told him, "I'm going to put you in jail tonight" and "You are going to spend the night in jail." (Wakgira Dep. at 27, 30; *see* Biruk Dep. at 29.)

By contrast, Officer Jones describes a different scene. He states that he never signaled Mr. Wakgira to enter the intersection. Instead, in the midst of directing traffic, he saw the headlights of Mr. Wakgira's car coming at him and "jumped out of the way." (Jones Dep. at 79.) Officer Jones yelled, "Stop, stop, stop," then ran to the car and yelled "stop" again. (*Id.*) Mr. Biruk, sitting in the front passenger seat, heard Officer Jones order Mr. Wakgira to stop. (Mullenix Decl., Ex. 3 (Deposition of Soloman Biruk ("Biruk Dep. II") at 17.) In response, Mr. Wakgira allegedly said, "No." (Jones Dep. at 79.) Officer Jones grabbed the hinge of the driver's side door with his left hand and looked directly at Mr. Wakgira when he told him to stop. (*Id.*) After Mr. Wakgira allegedly said "no," Officer Jones hit him on the forehead with his flashlight. (*Id.*) He told Mr. Wakgira to stop and Mr. Wakgira again said "no." (*Id.*) Officer Jones then hit Mr. Wakgira with his flashlight again and Mr. Wakgira stopped. (*Id.*) Officer Jones states that Mr. Wakgira, when asked why he had not stopped, told him, "It was my turn to go." (Jones Dep. at 88.)

Mr. Wakgira's car stopped on the northeast side of the crosswalk connecting the northwest corner to the northeast corner. (Wakgira Dep. at 40.) The parties agree that

Mr. Wakgira was bleeding from the forehead. (Jones Dep. at 88.) Photographs taken at the scene of the incident show Mr. Wakgira with a cut on his forehead above his right eye and with a significant amount of what appears to be blood on his white Seahawks sports jersey. (Howell Decl., Ex. J (Dkt. # 31-11).) Mr. Wakgira was taken to a hospital for treatment. (Wakgira Decl. ¶ 13.) He states that he received seven stitches as a result of the blows struck by Officer Jones. (Wakgira Decl. ¶ 12.)

The parties have offered contradictory evidence as to whether there were pedestrians crossing from the northwest to the northeast corner at the time of the incident. Offer Herron states that there were "a lot" of pedestrians in the crosswalk. (Herron Dep. at 27.) Officer Jones and Officer Lukaszeski also assert that there were pedestrians in the crosswalk. (Jones Dep. at 47; Declaration of Edward Lukaszeski (Dkt. # 27) ¶ 5.) By contrast, Mr. Wakgira states that he "never" saw a pedestrian crossing Fourth in the crosswalk between the northwest and northeast corners. (Wakgira Dep. at 12 ("Nobody was crossing."), 18; Wakgira Decl. ¶ 10 ("When my car was proceeding through the intersection, there was not a single pedestrian crossing.").) Mr. Biruk agrees that there was "nobody" in the crosswalk at the time Mr. Wakgira drove into the intersection.[2] (Biruk Dep. at 29.) Jeanna Pruitt, a bystander who was standing

---

[2] In his response, Mr. Wakgira states that Gobena Wakgira "testified that there were no people crossing the street." (Resp. at 7 (citing Howell Decl., Ex. G (Deposition of Gobena Wakgira) (Dkt. # 31-8) at 16).) However, the excerpts of Gobena Wakgira's deposition attached to Mr. Howell's declaration do not include page 16.

on the northeast corner of the intersection, also suggests that there were no pedestrians in

the crosswalk:

> Q: All right. Was there any danger to any pedestrians that—
>     MR. MULLENIX: Objection to the form.
> Q: You may answer?
> A: No, there was — I didn't see any people over here. He pulled right up
> next to me.
> Q: All right. And the record should reflect when you said you didn't see
> any people next to you, you are talking on the north?
> A: On the road. There was —
> Q: On Fourth Avenue South, there was no people there?
> A: No. It was just, it was my fiancé, my brother-in-law and me.

(Pruitt Dep. at 8-9.) Travis Lemarr, another bystander, made similar statements in his

deposition:

> Q: Okay. Well, did it appear to you that any pedestrians were in danger
> that the officer had to act in the way he did?
> A: The only danger to pedestrians that there was, was us standing on the
> corner because of what the cop did. There was nobody else walking
> anywhere. We were all waiting for the signal to go.

(Howell Decl., Ex. I (Deposition of Travis Lemarr) (Dkt. # 31-10) at 12.) Jason Lemarr

also recalls that there were no pedestrians in the crosswalk, at least in the northeast

portion:

> Q: All right. Was there any, were there any pedestrians in the intersection
> on Fourth Avenue South where the car was coming to rest?
> A: No.

(Howell Decl., Ex. H (Deposition of Jason Lemarr) (Dkt. # 31-9) at 8.) Finally, Michael

Clingman stated that he could not be sure whether there were pedestrians in the

crosswalk:

Q: Do you know whether there were people crossing the street when the car was going? And by crossing the street, I mean crossing from west to east or east to west when the Wakgira car was moving?

A: Again, I can't say for sure if there was anybody going from east to west. I'm almost positive there was people going from north to south.

(Howell Decl., Ex. F (Deposition of Michael Clingman) (Dkt. # 31-7) at 11.)

Following the incident, Officer Jones called other officers to the scene. These officers arrested Mr. Wakgira for reckless driving in violation of Seattle Municipal Code ("SMC") § 11.56.120(A) and failure to obey in violation of SMC § 11.59.090. The officers took Mr. Wakgira to a hospital and then booked him into the King County Jail. (Mullenix Decl., Ex. 5 (Pl. Answers to Interrogatories) ("Interrogs.") ¶ 5; Mot. at 7; Wakgira Decl. ¶ 13.) Mr. Wakgira did not speak with officers either at the scene of the incident or at the hospital. (Interrogs. ¶ 5.) When asked to talk by an officer at the scene of the incident, Mr. Wakgira said he did not want to talk until after conferring with his lawyer. (*Id.*)

On September 4, 2007, the City filed a criminal complaint against Mr. Wakgira for reckless driving and failure to obey in Seattle Municipal Court in *City of Seattle v. Wakgira*, Case No. 511485. (Mullenix Decl., Ex. 7 (Crim. Compl.).) The case docket indicates that, on September 5, 2007, the Seattle Municipal Court made a finding of probable cause, accepted Mr. Wakgira's pleas of not guilty, and released him. (Mullenix Decl., Ex. 8 (Seattle Municipal Ct. Dkt.) at 2.) The docket further indicates that the court dismissed the charges with prejudice on February 5, 2008, after Officer Jones

failed to appear at the jury trial because he was out of the country. (Seattle Municipal Ct. Dkt. at 3.)

On September 6, 2007, Gobena Wakgira telephoned the Seattle Mayor's Office to complain about the incident. (*See* Mullenix Decl., Ex. 9 (Email, dated Sept. 6, 2007, from Haddis Tadesse to R. Gil Kerlikowske).) The Mayor's Office reported the complaint to Chief of Police R. Gil Kerlikowske, and the Seattle Police Department's Office of Professional Accountability ("OPA") initiated an investigation. (*Id*.; Mullenix Decl., Ex. 10 (OPA Investigation Intake Form) ("OPA Intake Form").) Mr. Wakgira did not file a separate complaint about the incident.

Sergeant Alan Williams, an OPA investigator, conducted the investigation into Gobena Wakgira's complaint. As part of the investigation, he reviewed the documentary and photographic evidence and sworn statements of Officers Jones, Herron, Lukaszeski, and Michael Renner and of Sergeant Steve Ameden. In addition, he made repeated attempts to speak with Mr. Wakgira, Gobena Wakgira, and Mr. Biruk about the incident, but they declined to participate in the investigation. (Mullenix Decl., Ex. 11 (OPA Investigation Case Summary) ("OPA Summary") at 2-3; Mullenix Decl., Ex. 12 (OPA Investigation Follow-Up Form) ("OPA Follow-Up") at 1-3.) Raymond Connell, Mr. Wakgira's attorney in the state court criminal proceedings, told Sergeant Williams that he would provide the names and contact information of witnesses and Mr. Wakgira's medical records, but he did not follow-through with these representations

despite repeated reminders from Sergeant Williams. (OPH Summary at 2-3.) In his

deposition, Mr. Biruk agreed that he did not participate in the OPA investigation:

> Q: Anyone. Have you described the events or been asked to talk about the
> events?
> A: No. The police officer investigator called me, but I was so busy. I did
> not call him back. They wanted to ask me – to interview me.
> Q: So you were never interviewed?
> A: No. They did not interview me.
> Q: Did he call you more than once, this investigator?
> A: I think he left twice, yeah, a message. But I kept telling, I'll call you
> back but I did not call back.
> Q: You did not. Was there a reason you did not?
> A: I'm busy today to come here, you know I can't – very, very hard.

(Biruk Dep. at 25-26.) On January 5, 2008, Sergeant Williams completed the case

summary. (*See* OPA Follow-Up at 3.) In turn, Acting Captain Michael T. Kebba

submitted a memorandum discussing the case and recommending a disposition of

exonerated to Captain Fred Hill. (Mullenix Decl., Ex. 15 (Memorandum, dated January

23, 2008) ("Kebba Mem.").) On February 21, 2008, Captain Hill concurred with the

recommendation. (Kebba Mem. at 3) Acting Assistant Chief Paul McDonagh also

concurred with the exoneration. (*Id*.) On March 3, 2008, Kathryn Olson, Director of the

OPA, certified the investigation as complete. (Mullenix Decl., Ex. 16 (Certification of

Completion and OPA Disposition).) On April 8, 2008, the Seattle Police Department

mailed Gobena Wakgira a letter from Chief Kerlikowske, signed by Captain Tag

Gleason of the OPA, informing him that investigation had exonerated Officer Jones.

(Mullenix Decl., Ex. 17 (Letter, dated April 8, 2008); Howell Decl., Ex. L (same, with

signatures and letterhead).) On May 2, 2008, Mr. Wakgira filed a claim for damages

and on July 22, 2008, filed the instant civil rights complaint against Officer Jones, the City, and five John Doe officers of the Seattle Police Department. (*See* Mullenix Decl., Ex. 18 (Claim for Damages); Compl. (Dkt. # 1).)

## II.   ANALYSIS

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007). The moving party bears the initial burden of showing there is no material factual dispute and that he or she is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party meets his or her burden, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Cline v. Indus. Maint. Eng'g. & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000).

### A.   Federal Civil Rights Claim Against Officer Jones

Mr. Wakgira alleges that Officer Jones used excessive force in violation of the Fourth and Fourteenth Amendments of the United States Constitution and brings suit under 42 U.S.C. § 1983. (Compl. ¶ 28; Resp. at 15-16.) The Fourth Amendment, applied to the states via the Fourteenth Amendment, guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const., amend. IV. Officer Jones argues that he is shielded from suit and liability for any alleged constitutional violation under the doctrine of qualified immunity. (Mot. at 13-17.)

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, __ U.S. __, 129 S.Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In determining whether an officer is entitled to qualified immunity, the court engages in a two-step analysis.[3] The court first asks: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the answer is no, the court need not inquire further. By contrast, if a constitutional violation could be made out on a favorable view of the parties' submissions, then the court must ask "whether the right was clearly established." *Id.* In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 202 (internal quotation marks and citation omitted).

　　1. Do the Facts Alleged Show that Officer Jones Violated a Constitutional Right?

Courts analyze Fourth Amendment excessive force claims under the framework established by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989). The

---

[3] In *Pearson*, the Supreme Court clarified that the two-step sequence, although often appropriate, is not mandatory. Rather, courts must "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, __ U.S. __, 129 S. Ct. at 818. In this matter, the court will address the qualified immunity inquiry in the usual two-step sequence of *Saucier*.

basic test under *Graham* is one of objective reasonableness. This requires courts to balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against "the countervailing government interests at stake." *Graham*, 490 U.S. at 396; *see Tekle v. United States*, 511 F.3d 839, 844-45 (9th Cir. 2007); *Smith v. City of Hemet*, 394 F.3d 689, 700 (9th Cir. 2005) (en banc); *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003). In doing so, "[t]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham*, 490 U.S. at 397. "The question is not simply whether the force was necessary to accomplish a legitimate police objective; it is whether the force used was reasonable in light of *all* the relevant circumstances." *Hammer v. Gross*, 932 F.2d 842, 846 (9th Cir. 1991) (emphasis in original). The Supreme Court cautions that the reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

In the Ninth Circuit, the objective reasonableness inquiry under *Graham* is a three-step analysis: First, the court must assess the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force used. *Miller*, 340 F.3d at 964. Second, the court must assess the importance of the governmental interests at stake by considering the *Graham* factors: (1) the severity of the crime, (2) whether the suspect posed an immediate threat to the safety of the officer and others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Id.* Third, the court must balance "the gravity of the intrusion on the individual

against the government's need for that intrusion to determine whether it was constitutionally reasonable." *Id.*

### i. Gravity of the Intrusion

The force used to seize Mr. Wakgira was not insubstantial: Officer Jones struck him at least twice on the right side of his forehead with a plastic flashlight. The parties agree that Officer Jones struck Mr. Wakgira hard enough to cut or break his skin and that Officer Jones struck him in the head as opposed to a less vulnerable part of his body. On the present record, although it is difficult to evaluate the strength used by Officer Jones in delivering the blows and the nature of the plastic flashlight as a weapon, the court is satisfied for purposes of the instant motion that Officer Jones used meaningful force against Mr. Wakgira in making the seizure.

### ii. Importance of the Governmental Interests at Stake

The governmental interests at stake are not particularly strong when viewing the evidence in the light most favorable to Mr. Wakgira. Officer Jones argues that he acted reasonably in striking Mr. Wakgira on the assumption that Mr. Wakgira's actions threatened the safety of pedestrians allegedly crossing between the northwest and northeast corners of the intersection. (Mot. at 15.)

First, the alleged crimes at issue—reckless driving under SMC § 11.56.120(A) and failure to obey under SMC § 11.59.090(A)—are modestly serious. SMC § 11.56.120(A) provides that "[a]ny person who drives any vehicle in the City in willful or wanton disregard for the safety of persons or property is guilty of reckless driving."

SMC § 11.59.090(A) provides that "[a]ny person requested or signaled to stop by a peace officer for a traffic infraction has a duty to stop." Officer Jones argues that the facts on the scene gave rise to a fair probability that Mr. Wakgira violated both code provisions. (Mot. at 22-23.)

The evidence, taken in the proper light, does not support the conclusion that a reasonable officer would have understood Mr. Wakgira to be driving recklessly in violation of SMC § 11.56.120(A). Accepting Mr. Wakgira's allegation that Officer Jones signaled for him to drive into the intersection, it is difficult to discern how an officer could reasonably believe Mr. Wakgira was driving with willful or wanton disregard for the safety of pedestrians in violation of SMC § 11.56.120(A) when acting on the officer's own instructions. Officer Jones contends that the court need not decide whether he signaled Mr. Wakgira to enter the intersection. (Reply (Dkt. # 34) at 3.) For purposes of this motion, however, the court will assume that Officer Jones directed Mr. Wakgira to enter the intersection because Mr. Wakgira has presented evidence in support of this contention. In essence, Officer Jones asks the court to overlook key evidence with the potential to strongly color the entire interaction between the parties in favor of viewing Officer Jones's actions in a narrow and artificial vacuum. The court declines to do so. As the Ninth Circuit teaches, the relevant question "is whether the force used was reasonable in light of *all the relevant circumstances*." *Hammer*, 932 F.2d at 846 (emphasis added). Plainly, whether Officer Jones signaled Mr. Wakgira to drive into the intersection is one of the many relevant considerations upon which a

reasonable officer's actions and a jury's verdict might turn. Specifically, a jury might consider the evidence that Officer Jones signaled Mr. Wakgira to drive into the intersection in conjunction with the evidence that there were no pedestrians in the crosswalk, and thereby reasonably infer that Officer Jones knew both that there were no pedestrians in the intersection and that Mr. Wakgira was not driving in violation of SMC § 11.56.120(A). Furthermore, the evidence suggests that Mr. Wakgira was driving very slowly, which diminishes any potential recklessness or danger to pedestrians. (Pruitt Decl. at 8.) Finally, the court notes that Officer Jones's particular use of force—striking the driver of a moving vehicle in the head with a flashlight and knocking off his glasses—is not the type of force ordinarily associated with making a driver less reckless. Thus, viewing the evidence in the light most favorable to Mr. Wakgira, the court finds that a reasonable officer would have little to no reason to believe that Mr. Wakgira was violating SMC § 11.56.120(A) when he drove into the intersection.

Similarly, although a reasonable officer might initially have believed that Mr. Wakgira had failed to comply with his commands to stop in violation of SMC § 11.59.090(A), the facts, viewed in the light most favorable to Mr. Wakgira, strongly undermine this contention when taken as a whole. Officer Jones ordered Mr. Wakgira to stop with clear, simple, and well-articulated commands. At this point and without more, a reasonable officer could have believed Mr. Wakgira deliberately chose not to obey his commands. Mr. Wakgira, however, allegedly responded to Officer Jones with a question—"What did you say?"—that he repeated three times and that underscored that

he had not heard or understood the commands to stop. (Wakgira Dep. at 26.) Without repeating his command, Officer Jones struck Mr. Wakgira in the head with his flashlight. (*Id*.) On these facts, it is again difficult to understand how a reasonable officer could have believed that Mr. Wakgira had deliberately chosen to disobey his commands if he had not heard the commands. Next, Officer Jones emphasizes that Mr. Wakgira did not stop even after the first blow. Mr. Wakgira, however, states that, after being struck in the forehead above his right eye, he was bleeding, he could not see because Officer Jones had knocked off his glasses, and he told Officer Jones that he would stop if given a chance to do so. (Wakgira Dep. at 27; Wakgira Decl. ¶ 8.) Mr. Wakgira's failure to stop immediately after sustaining a blow to the head is not surprising. On this view of the facts, the court is not persuaded that an officer could reasonably have believed Mr. Wakgira to be in violation of SMC § 11.59.090(A).

In sum, while the court is mindful of the moderate seriousness of reckless driving and failure to obey a police officer, the circumstances of this case, when viewed in the light most favorable to Mr. Wakgira, are not such as to warrant the conclusion by a reasonable officer that Mr. Wakgira was a dangerous criminal, that he acted with willful or wanton disregard for the safety of others, that he deliberately disobeyed Officer Jones's commands, or that his alleged crimes were especially egregious. Under these circumstances, the nature of the alleged crimes at issue provides little basis for Officer Jones's use of physical force.

ORDER - 18

Second, viewing the evidence in the light most favorable to Mr. Wakgira, a reasonable officer would not have believed that Mr. Wakgira's actions posed a threat to the safety of pedestrians or himself. Accepting Mr. Wakgira's allegations that there were no pedestrians in the crosswalk and that Officer Jones signaled Mr. Wakgira to drive into the intersection, a reasonable jury could infer that Officer Jones signaled Mr. Wakgira to proceed precisely because he knew there were no pedestrians in danger. Likewise, Mr. Wakgira states that Officer Jones did not jump out of the way of his car and "was at least a good 8 feet away." (Wakgira Decl. ¶ 7.) Having signaled Mr. Wakgira into the intersection, a reasonable officer would not have been in acute fear for his safety.

Third, viewing the evidence in the light most favorable to Mr. Wakgira, a reasonable officer would not have believed that Mr. Wakgira was either actively resisting arrest or attempting to evade arrest by flight. Officer Jones does not contend that Mr. Wakgira actively resisted arrest; rather, he asserts that Mr. Wakgira attempted to evade arrest by flight. (Mot. at 15.) Looking at the totality of the circumstances, particularly the allegations that Mr. Wakgira did not hear Officer Jones's commands to stop and repeatedly articulated that he had not understood those commands, that Officer Jones's first blow to Mr. Wakgira's head knocked off his glasses, and that Mr. Wakgira repeatedly told Officer Jones he would stop if given the opportunity to do so, a reasonable officer would not have believed that Mr. Wakgira intended to flee.

Overall, viewing the evidence in the light most favorable to Mr. Wakgira, the *Graham* factors demonstrate at most minimal governmental interests underlying Officer Jones's use of force.[4]

### iii. On Balance, Officer Jones's Use of Force Was Not Reasonable

Finally, in balancing the gravity of the intrusion against the government's interests, the court cannot conclude that Officer Jones's use of force was constitutionally reasonable. Instead, when the disputed facts and inferences are viewed in the light most favorable to Mr. Wakgira, an officer in Officer Jones's position could not reasonably have concluded that the force used was reasonable under the circumstances. The court acknowledges that Officer Jones was forced to make a split-second judgment as to the appropriate amount of force necessary in a tense, uncertain, and rapidly evolving situation. *Graham*, 490 U.S. at 396-97. If this case proceeds to trial, a jury may draw inferences different than those the court must indulge on a motion for summary judgment. Nonetheless, accepting the evidence in the light most favorable to Mr. Wakgira, it is evident that the key question—whether the force used here was objectively reasonable—is a matter that cannot be resolved in favor of Officer Jones on summary judgment. As the Ninth Circuit has repeatedly emphasized, "the reasonableness of force used is ordinarily a question of fact for the jury." *Liston v.*

---

[4] A court may also consider the availability of alternative methods of capturing or subduing a suspect as part of the *Graham* analysis. *Smith*, 394 F.3d at 703. Here, the parties have not briefed the court with respect to alternative methods. The court thus declines to consider this additional factor.

*County of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997); *see Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). Therefore, the court concludes that the facts alleged, when viewing the evidence in the light most favorable to Mr. Wakgira, show that a reasonable jury could find that Officer Jones used excessive force.

2. Was the Constitutional Right Clearly Established?

Having determined that a violation of the Fourth Amendment could be made out on a favorable view of Mr. Wakgira's evidence, the court must ask whether the right was clearly established. *Saucier*, 533 U.S. at 201. In other words, the court must determine whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Id.* at 202. If a right is clearly established by decisional authority of the Supreme Court or the Ninth Circuit, then the court need inquire no further. *Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004). When there are few binding cases on point, however, courts look to non-binding case law, including "decisions of state courts, other circuits, and district courts." *Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir. 2003).

Mr. Wakgira argues that the law was clearly established at the time of the incident such that Officer Jones could not have believed that his conduct was lawful. (Resp. at 15.) He rests this assertion on *Graham*, which establishes the basic analysis for excessive force claims, without citation to other case law. (*Id.*) The Supreme Court has cautioned, however, that *Graham* is "cast at a high level of generality," and ordinarily does not provide the type of clear answer required by this prong of the

qualified immunity analysis, although it may be sufficient in an obvious case. *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).

The court finds that *Graham* and its progeny clearly establish the proposition that repeatedly striking a driver with a plastic flashlight in the forehead, where the driver entered the intersection on the officer's signal, was driving very slowly, and expressed to the officer that he had not heard the command to stop, constitutes use of excessive force under the Fourth Amendment. *See Baltimore v. City of Albany, Ga.*, 183 Fed. Appx. 891, 898-90 (11th Cir. 2006) (holding that striking an arrestee over the head with a heavy flashlight constitutes the type of obvious use of excessive force clearly established by general case law); *Marley v. Crawford County, Ark.*, 383 F. Supp. 2d 1129, 1133 (W.D. Ark. 2005) ("There is no doubt that striking a detainee in the head with a baton or flashlight when he is not resisting constitutes excessive force."); *Hodsdon v. Town of Greenville*, 52 F. Supp. 2d 117, 124 (D. Me. 1999) (reasoning that "a gratuitous blow to the head with a blunt instrument would clearly constitute excessive force."); *see also Green v. New Jersey State Police*, 246 Fed. Appx. 158, 163 (3d Cir. 2007). The use of force, in the absence of a need for force, is excessive. The court thus concludes that the right was clearly established at the time of the incident.

In sum, the court concludes that Officer Jones is not entitled to qualified immunity. Accordingly, the court denies Officer Jones's motion for summary judgment with respect to Mr. Wakgira's § 1983 claim.

**B.   Federal Civil Rights Claim Against the City**

In his complaint, Mr. Wakgira alleges that the City is liable under 42 U.S.C. § 1983 for tolerating a pattern and practice of officers violating the rights of citizens, by ratifying the conduct of Officer Jones, and by acting with deliberate indifference to his rights.  (Compl. ¶ 30.)  In his response to the instant motion, Mr. Wakgira provides a single sentence of legal argument in support of his civil rights claim against the City: "The failure to discipline officers for police misconduct is a significant basis for municipal liability."  (Resp. at 24. (citing *Smith v. City of Fontana*, 818 F.2d 1411 (9th Cir. 1987), and *Gimble v. County of Suffolk*, 926 F.2d 142 (2d Cir. 1991).)

A municipality may be held liable under § 1983 when a governmental policy or custom causes the constitutional harm, but may not be held liable under *respondeat superior*.  *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978).  A plaintiff may establish municipal liability by proving "that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity" or "that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it."  *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992) (quotations omitted); *see also Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008).  A municipality may also be held liable on a theory of deliberate indifference.  *Christie v. Iopa*, 176 F.3d 1231, 1240 (9th Cir. 1999).

**1.   Pattern or Practice**

In order to establish municipal liability on a "pattern or practice" theory, a plaintiff must demonstrate either a formal governmental policy or a "longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity." *Gillette*, 979 F.2d at 1346. "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

Mr. Wakgira has failed to show a genuine issue of material fact as to the existence of either a formal policy of the City or a longstanding practice or custom. The court observes that Mr. Wakgira has provided, at most, a cursory analysis of the alleged legal and factual bases supporting this claim. A fair reading of his statement of facts and of the evidence attached to his response suggests that Mr. Wakgira argues the City may be held liable based on its "complete failure" to discipline Officer Jones with respect to his alleged use of excessive force despite 10 identified complaints of misconduct between 1989 and 2008. (*See* Resp. at 9-12; Howell Decl., Ex. M (Disciplinary Record) (Dkt. # 31-14); Jones Dep. at 7-24.)

Without discussing the details of Officer Jones's disciplinary record, the court is satisfied that the record, even when viewed in the light most favorable to Mr. Wakgira, neither constitutes a formal policy of the City nor reveals a longstanding practice or custom. The disciplinary record contains a patchwork collection of complaints, the majority of which involve allegations that Officer Jones could have been more polite

during traffic stops. The record further indicates, and Mr. Wakgira agrees, that the City has twice disciplined Officer Jones, in 1989 and 1990. (Disciplinary Record at 3-6; *see also* Reply at 9.) Plainly, the disciplinary record, in and of itself, does not contain or constitute a formal policy of the City. Likewise, the sporadic incidents in the disciplinary record do not rise to the level of a practice or custom because they do not demonstrate a traditional method of carrying out policy. *See Trevino*, 99 F.3d at 918. Viewing the evidence in the light most favorable to Mr. Wakgira, the court concludes that Mr. Wakgira has not demonstrated an issue of material fact with respect to whether the City can be held liable under § 1983 on a pattern or practice theory. Accordingly, the court grants summary judgment in favor of the City with respect to this claim.

### 2. Ratification

A municipality can be liable under § 1983 for an isolated constitutional violation when an official with final policymaking authority ratifies a subordinate's decision, thereby approving the decision and the basis for it. *Fuller v. City of Oakland*, 47 F.3d 1522, 1534 (9th Cir. 1995); *see Christie*, 176 F.3d at 1238-39. Courts look to state law to determine whether an official has final policymaking authority. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737; *Christie*, 176 F.3d at 1235. "To show ratification, a plaintiff must prove that the 'authorized policymakers approve a subordinate's decision and the basis for it,'" *id.* at 1239 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)), and that the policymaker's decision triggering liability was the product of a "conscious, affirmative choice" to ratify the conduct at issue, *Gillette*, 979 F.2d at 1347.

While ratification requires knowledge of the alleged constitutional violation, *Christie*, 176 F.3d at 1239, it "does not require knowledge that the approved conduct is actually unconstitutional," *Tubar*, No. C05-1154-JCC, 2008 WL 514932, at *6 (W.D. Wash. Dec. 5, 2008). In general, a single failure to discipline an officer does not rise to the level of ratification. *Haugen v. Brosseau*, 351 F.3d 372, 393 (9th Cir. 2003), *rev'd on other grounds*, 543 U.S. 194 (2004). However, municipal liability by ratification may attach where "the officials involved adopted and expressly approved of the acts of others who caused the constitutional violation." *Trevino*, 99 F.3d at 920.

Mr. Wakgira alleges that Chief Kerlikowske ratified Officer Jones's conduct by exonerating him at the close of the allegedly "perfunctory" OPA investigation, which relied on Officer Jones's version of events. (Resp. at 10.) He does not address the question whether Chief Kerlikowske is an official with final policymaking authority under Washington law.[5] The court will assume, however, that Chief Kerlikowske is such an official. *See Tubar v. Clift*, 2008 WL 514932, at *5 n.2; *Baldwin v. City of Seattle*, 776 P.2d 1377, 1381 (Wash. Ct. App. 1989). The court thus asks whether Chief Kerlikowske adopted and expressly approved of Officer Jones's alleged use of excessive force.

---

[5] Mr. Wakgira does not argue that other employees of the Seattle Police Department constitute officials with final policymaking authority or that Chief Kerlikowske delegated his authority. The court therefore declines to consider whether the City may be held liable based on the actions of officials other than Chief Kerlikowske.

ORDER - 26

In support of his contention that Chief Kerlikowske ratified Officer Jones's conduct, Mr. Wakgira submits a letter from Chief Kerlikowske, but signed by Captain Gleason of the OPA, to Gobena Wakgira informing him that Officer Jones had been exonerated of wrongdoing as a result of the OPA investigation.  (Resp. at 10; Howell Decl., Ex. L (Letter, dated April 9, 2008).)  He also contends that the "Use of Physical Force" report dated August 31, 2007, is "unusual" in certain respects.  (*Id.* (citing Howell Decl., Ex. K (Use of Physical Force Report) ("Use of Force Report") (Dkt. # 31-12).)  Further, the evidence shows that Chief Kerlikowske was made aware of the alleged use of excessive force at least as early as September 6, 2007, when he received an email about Gobena Wakgira's complaint.  (*See* Mullenix Decl., Ex. 9.)

Mr. Wakgira has not met his burden in showing a genuine issue of material fact with respect to municipal liability by ratification.  The evidence strongly suggests that Chief Kerlikowske had "knowledge of the *alleged* constitutional violation" and its factual basis.  *See Christie*, 176 F.3d at 1239 (emphasis added).  A jury could also reasonably infer that Chief Kerlikowske had knowledge of the OPA investigation and its finding.  (*See* Howell Decl., Ex. L.)  Nonetheless, even assuming Chief Kerlikowske knew of the incident, the OPA investigation, and the exoneration of Officer Jones, Mr. Wakgira has presented no evidence from which a jury could reasonably infer that Chief Kerlikowske participated in the OPA investigation, adopted or approved of Officer Jones's conduct, or otherwise ratified the alleged use of excessive force.

First, the letter from Chief Kerlikowske to Gobena Wakgira does not constitute an official finding on behalf of Chief Kerlikowske. Unlike the internal documents concerning the OPA investigation, in which various individuals recommended, reviewed, and concurred with the finding of exonerated, the letter merely notifies Gobena Wakgira of the resolution of his complaint. (*Compare* Mullenix Decl., Exs. 10-12, 14-16, *with* Howell Decl., Ex. L.) Even assuming Chief Kerlikowske had a hand in drafting or reviewing the letter—an assumption belied by the fact that the letter is signed by Captain Gleason, not Chief Kerlikowske—the letter is not a part of the OPA investigative process. There is no evidence to suggest that Chief Kerlikowkse either reviewed the finding or concurred with it as part of the OPA investigation. Without more, the fact that Chief Kerlikowske, through Captain Gleason, informed Gobena Wakgira of the finding is insufficient to establish a genuine issue of material fact as to whether he thereby ratified the finding. *Gillette*, 979 F.2d at 1348.

Second, Mr. Wakgira has presented no evidence in support of his bare assertion that OPA conducted a "perfunctory" investigation. Mr. Wakgira, Gobena Wakgira, and Mr. Biruk all chose not to participate in the OPA investigation despite repeated requests to do so. Absent a further showing, they cannot now be heard to complain that the investigation improperly relied on Officer Jones's version of events. Additionally, while Mr. Wakgira contends that the "Use of Physical Force" report, dated August 31, 2007, is unusual, this report was not prepared as part of the OPA investigation; indeed, Gobena Wakgira had not yet made his complaint and thus initiated the OPA investigation as of

this date. (*Compare* Use of Force Report (August 31, 2007), *with* OPA Intake Form (September 7, 2007).)

Third, the facts of this case are unlike those of *Fuller*, in which the Ninth Circuit concluded that municipal liability by ratification could attach where the chief of police reviewed and approved of an investigation allegedly performed in a sexually-biased fashion because the "grossly inadequate investigation" contained "glaring deficiencies." *Fuller*, 47 F.3d at 1535. Here, Mr. Wakgira has neither shown "glaring deficiencies" in the OPA investigation nor that Chief Kerlikowske concurred with the specific finding.

In sum, the court concludes that Mr. Wakgira has not presented sufficient evidence to demonstrate the existence of a genuine issue of material fact with respect to municipal liability by ratification. The court thus grants summary judgment in favor of the City with respect to this theory of liability.[6]

## C.    Assault and Battery Claims

Mr. Wakgira alleges claims for the intentional torts of assault and battery. (Compl. ¶¶19-20.) Under Washington law, it is not unlawful for a police officer to use force that is reasonable and necessary in the performance of a legal duty. RCW 9A.16.020(1). Officer Jones argues that he cannot be held liable for assault or battery

---

[6] The court declines to consider the argument that the City can be held liable under § 1983 on a theory of deliberate indifference. Mr. Wakgira raises this theory of municipal liability in his complaint (Compl. ¶ 30), but he does not present this argument in response to the City's motion for summary judgment. Accordingly, the court grants summary judgment in favor of the City on this theory of municipal liability.

because "on any reasonable view of the evidence, the facts available to Officer Jones made it reasonable and necessary to use force in convincing Wakgira to stop his car." (Mot. at 20.) As discussed above, the evidence, when viewed in the light most favorable to Mr. Wakgira, demonstrates that a reasonable officer would not have concluded that it was either reasonable or necessary to repeatedly strike Mr. Wakgira. The court therefore denies Officer Jones's motion for summary judgment with respect to the assault and battery claims.

## D. Outrage Claim

In Washington, the tort of outrage requires a plaintiff to establish proof of three elements: (1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result of severe emotional distress. *Kloepfel v. Bokor*, 66 P.3d 630, 632 (Wash. 2003); *Reid v. Pierce County*, 961 P.2d 333, 337 (Wash. 1998); *Grimsby v. Samson*, 530 P.2d 291, 295-96 (Wash. 1975). Here, Defendants argue that the court should grant summary judgment with respect to Mr. Wakgira's outrage claim because Officer Jones's conduct was objectively reasonable. (Mot. at 21.) As discussed above, viewing the evidence in the light most favorable to Mr. Wakgira, a reasonable jury could conclude that Officer Jones's use of force was not reasonable.

Nonetheless, Mr. Wakgira's outrage claim must be dismissed because it is subsumed within and cognizable under his state law assault and battery claims. Mr. Wakgira argues that Officer Jones committed the tort of outrage when he struck him with the flashlight. (Resp. at 20-21.) Although he alludes to having suffered "severe

emotional distress," Mr. Wakgira provides no allegations beyond the facts of the alleged assault. In *Rice v. Janovich*, 742 P.2d 1230, 1238 (Wash. 1987), the Washington Supreme Court held that a plaintiff cannot recover on an outrage theory when damages for mental or emotional distress are already recoverable under an assault claim. *See also Bankhead v. City of Tacoma*, 597 P.2d 920, 925 (Wash. Ct. App. 1979) (affirming dismissal of outrage claim on motion for summary judgment because plaintiff had an assault claim). In support of his outrage claim, Mr. Wakgira has neither pleaded nor argued facts distinct from those alleged as part of his assault and battery claims. The court thus dismisses his outrage claim. To the extent Mr. Wakgira seeks to recover for outrage on these facts, he must do so pursuant to his assault and battery claims.

**E.      False Arrest, False Imprisonment & Malicious Prosecution Claims**

In Washington, probable cause is a complete defense to claims of false arrest, false imprisonment, or malicious prosecution. *Hanson v. City of Snohomish*, 852 P.2d 295, 298, 301 (Wash. 1993). On September 5, 2007, the Seattle Municipal Court made a finding of probable cause in the criminal case against Mr. Wakgira. (Seattle Municipal Ct. Dkt. At 2.) Defendants argue that collateral estoppel bars Mr. Wakgira from relitigating the issue of probable cause. (Mot. at 23-24.) Mr. Wakgira does not respond to this argument.

The doctrine of collateral estoppel precludes relitigation of an issue after the party estopped has had a full and fair opportunity to present his case. *Hanson*, 852 P.2d at 299-300; *see generally* Philip A. Trautman, *Claim and Issue Preclusion in Civil*

*Litigation in Washington*, 60 WASH. L. REV. 805 (1985). State law governs the application of collateral estoppel in federal civil rights cases. *Allen v. McCurry*, 449 U.S. 90, 96 (1980); *Ayers v. City of Richmond*, 895 F.2d 1267, 1270 (9th Cir. 1990). In Washington, "[t]he doctrine may be applied in a civil action in which a party seeks to retry issues resolved against a defendant in a previous criminal case, as well as in a civil rights action in which issues raised are the same as those determined in a criminal case." *Hanson*, 852 P.2d at 300. The party asserting the defense must establish that (1) the issue decided in the prior adjudication is identical to the one presented in the second; (2) the prior adjudication ended with a final judgment on the merits; (3) the party against whom the doctrine is asserted was a part or was in privity with a party to the prior adjudication; and (4) application of the doctrine does not work an injustice. *Id.*; *State Farm Mut. Auto. Ins. Co. v. Avery*, 57 P.3d 300, 304 (Wash. Ct. App. 2002).

Here, collateral estoppel bars Mr. Wakgira's claims for false arrest, false imprisonment, and malicious prosecution because the issue of probable cause has already been determined in state court. Defendants have established the elements of collateral estoppel: the issue decided by the Seattle Municipal Court is identical to the issue here presented, the prior adjudication ended with a final judgment on the merits, Mr. Wakgira was a party in state court and present at the hearing on probable cause, and application of the doctrine does not work an injustice because Mr. Wakgira had an opportunity to litigate this issue in state court. *See Hanson*, 852 P.2d at 300. This court is thus bound by the state court's determination of probable cause, which operates as a

complete defense to Mr. Wakgira's claims. Accordingly, the court grants summary judgment in favor of Defendants with respect to the claims for false arrest, false imprisonment, and malicious prosecution.

**F.     Negligent Infliction of Emotional Distress Claim**

Mr. Wakgira concedes that the court should grant summary judgment in favor of Defendants with respect to his claim for negligent infliction of emotional distress. (Resp. at 1, 13.) The court therefore grants summary judgment with respect to this claim.

**G.     Claims Against John Doe Seattle Police Officers 1 Through 5**

Mr. Wakgira also concedes that the court should grant summary judgment in favor of Defendants with respect to his claims against five John Doe Seattle Police Officers. (Resp. at 1, 13.) The court therefore grants summary judgment with respect to these claims.

### III.     CONCLUSION

For the forgoing reasons, the court GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment. In sum, the court rules as follows:

(1)     The court DENIES summary judgment with respect to Mr. Wakgira's federal civil rights claim against Officer Jones and his assault and battery claims;

(2)     The court GRANTS summary judgment in favor of Defendants with respect to Mr. Wakgira's federal civil rights claim against the City, his outrage claim,

his false arrest, false imprisonment, and malicious prosecution claims, and his negligent infliction of emotional distress claim; and

(3)    The court GRANTS summary judgment and dismisses the claims against the five John Doe officers of the Seattle Police Department.

Dated this 3rd day of August, 2009.

JAMES L. ROBART
United States District Judge